IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

CLARA L. BETH,                    )
                                  )
            Plaintiff,            )
                                  )
     v.                           )   Case No.
                                  )   05-3208-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner    )
of Social Security,               )
                                  )
            Defendant.            )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Clara Beth seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to find plaintiff's impairments severe, (2) giving disproportionate weight to the opinion of state agency consultative examiner Thomas Corsolini, and (3) failing to properly consider plaintiff's credibility. Alternatively, plaintiff argues that her case should be remanded for consideration of new and material evidence. I find that substantial evidence in the record as a whole supports the ALJ's decision in finding plaintiff not credible, in relying on the opinion of Dr. Corsolini, and in finding that plaintiff's impairments are not severe. Additionally, I find that there is no basis for a remand.

Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed, and plaintiff's alternative request for remand will be denied.

## I. BACKGROUND

On May 1, 2003, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since October 26, 2001[1]. Plaintiff's disability stems from a neck and back injury, left leg nerve injury, seizures in her back, leg pain and numbness, and numbness in both hands. Plaintiff's application was denied on July 11, 2003. On September 8, 2004, a hearing was held before an Administrative Law Judge. On November 15, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On March 11, 2005, the Appeals Council denied a request for review. On June 3, 2005, after review of additional evidence, the Appeals Council again denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1]During the administrative hearing, her alleged onset date was amended to November 20, 2000 (Tr. at 26, 191).

Case 6:05-cv-03208-REL   Document 12   Filed 12/12/05   Page 2 of 45

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might

Case 6:05-cv-03208-REL   Document 12   Filed 12/12/05   Page 3 of 45

accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id.</u>; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

4

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

5

***IV. THE RECORD***

The record consists of the testimony of plaintiff and documentary evidence admitted at the hearing and prior to review by the Appeals Council.

***A. ADMINISTRATIVE REPORTS***

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1968 through 2004:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1968 | $    242.45 | 1987 | $  1,771.25 |
| 1696 | 1,080.68 | 1988 | 10,069.80 |
| 1670 | 1,275.80 | 1989 | 2,631.34 |
| 1971 | 2,722.78 | 1990 | 5,139.52 |
| 1972 | 4,367.10 | 1991 | 15,399.06 |
| 1973 | 2,821.67 | 1992 | 17,122.27 |
| 1974 | 2,621.28 | 1993 | 9,511.73 |
| 1975 | 2,964.59 | 1994 | 277.76 |
| 1976 | 1,679.86 | 1995 | 6,053.78 |
| 1977 | 3,865.33 | 1996 | 11,915.02 |
| 1978 | 957.07 | 1997 | 4,586.81 |
| 1979 | 91.19 | 1998 | 1,681.18 |
| 1980 | 9,728.80 | 1999 | 12,455.33 |

Case 6:05-cv-03208-REL   Document 12   Filed 12/12/05   Page 6 of 45

| 1981 | 7,406.74 | 2000 | 20,961.31 |
|------|----------|------|-----------|
| 1982 | 14,498.48 | 2001 | 3,652.87 |
| 1983 | 3,661.88 | 2002 | 518.02 |
| 1984 | 6,311.26 | 2003 | 0.00 |
| 1985 | 3,855.00 | 2004 | 0.00 |
| 1986 | 0.00 | | |

(Tr. at 63, 65).

**Claimant Questionnaire**

In a Claimant Questionnaire completed on May 19, 2003, plaintiff reported that her back seizures are "almost under control they are more like spasms" which she said occur once or more per month depending on if she moves or lifts anything (Tr. at 100). She reported that sometimes she makes it a month without a spasm in her back (Tr. at 100). For relief of pain, she reported that she drinks apple cider vinegar, sleeps on ice bags, and tries to walk a block or so in the middle of the day (Tr. at 100). She intended to start one half hour of low impact aerobic exercise (Tr. at 100).

Plaintiff said she could walk for about 45 minutes before she needs to rest (Tr. at 101). Plaintiff can read fine, she can spend about 30 minutes at a time cooking, she

7

can shop for an hour, and she reported using her computer for an hour or so every day (Tr. at 101-102).

When asked how often she goes out of the house, plaintiff reported that she takes a bus to go visit friends for a couple of weeks or more every six months if someone sends her a ticket (Tr. at 102). She was able to run errands, go to the store, and go to doctors, which would take about one to two hours (Tr. at 102).

**Claimant Form**

Plaintiff completed a supplemental form on March 30, 2004 (Tr. at 104-108). She reported that she is able to do laundry, dishes, make her bed, change sheets, vacuum, sweep, take out the trash, bank, and go to the post office (Tr. at 106). She reported that she is not able to iron, do home repairs or car maintenance, mow her lawn, rake leaves, or garden (Tr. at 106). She listed her hobbies as watching television, sitting outside, or using her computer (Tr. at 107). She was able to drive to the grocery store to buy things like dog food and groceries (Tr. at 107).

**Medical Expenses Form**

Plaintiff obtained her medication from Greenfield Pharmacy (Tr. at 109-110). During the 14 months from December 5, 2001, through January 21, 2003, plaintiff spent

8

$1,610.70.  Plaintiff's mother paid for her medication until she passed away (Tr. at 102, 108).  According to the ALJ's order, plaintiff's mother passed away in March 2004.

**Office of Hearings and Appeals Questionnaire**

This form was competed on June 18, 2004 (Tr. at 114-116).  In this form, plaintiff reported that she has no difficulty standing or walking (Tr. at 115).  She said she could sit for 30 minutes before her leg gave her problems (Tr. at 115).

**B.    *SUMMARY OF TESTIMONY***

The administrative hearing was held on September 8, 2004.  At that time, plaintiff was 53 years of age and is currently 54 (Tr. at 167).  Plaintiff is divorced, and she has no children (Tr. at 167).  Plaintiff was 5' 3" tall and weighed 215 pounds (Tr. at 167).  She had gained 25 pounds in the past two months because "I hardly move and I'm eating garbage food." (Tr. at 168).  Plaintiff smokes one pack of cigarettes every three days (Tr. at 195).  When asked whether she drinks alcohol, plaintiff testified that she does not and that she never has other than an occasional mixed drink at a party when she was in her 30's (Tr. at 195-196).

Case 6:05-cv-03208-REL   Document 12   Filed 12/12/05   Page 9 of 45

Plaintiff has high triglycerides and is supposed to take medicine, but it costs $34.20 so she does not take it (Tr. at 196).  Instead, she tries not to eat any cheese and she takes over-the-counter garlic pills (Tr. at 196).

Plaintiff graduated from high school and then was trained in phlebotomy[2] (Tr. at 168-169).  In March 2001, plaintiff's father died and she and her mother moved from Reno, Nevada, to Missouri to be closer to her grandmother (Tr. at 82, 193).  Plaintiff's mother bought a house, and then 18 months later passed away from a stroke (Tr. at 194). Plaintiff currently lives alone in her late mother's house (Tr. at 169).  The house is going through probate, and plaintiff expects that her sister will take the house since she can make the payments and plaintiff could not qualify for a loan (Tr. at 194).  Plaintiff's sister makes good money and she will pay for the house and let plaintiff live there (Tr. at 194).

In early 2003, plaintiff worked at a convalescent home for seven or eight days as a certified nurse's assistant (Tr. at 170).  In 2000 she worked in a rehab center as a

---

[2]Removing blood from a vein.

certified nurse's assistant, and did that job for about two years (Tr. at 170).

With no source of income since approximately 2000, plaintiff has her bills paid by her sister (Tr. at 170). On a typical day, plaintiff will get up around 8:30 or 9:30 and let her animals out and then pick something to watch on television (Tr. at 171, 180). Plaintiff watches the weather channel and the mystery channel (Tr. at 188-189). Plaintiff has a cat and two dogs (Tr. at 175). She feeds her cat, and then she makes something for herself to eat around 2:00 or 3:00 (Tr. at 171). She watches television most of the day (Tr. at 171). Plaintiff starts taking sleeping pills around 9:00 p.m. (Tr. at 192). She is unable to sleep for more than about two hours at a time, so she continues to take sleeping pills when she wakes up at night (Tr. at 192).

Plaintiff's neighbor has taken care of her lawn for the past two or three years (Tr. at 171). Plaintiff washes dishes once every two or three weeks (Tr. at 171). She uses a lot of plastic dishes (Tr. at 171). Plaintiff does her own laundry (Tr. at 174). Plaintiff only does a little dusting, and she waters her plants only about once every two weeks (Tr. at 171-172). Plaintiff does not clean her bathroom because she does not get it dirty; however, she

11

does wipe the sink out (Tr. at 172). She does not sweep (Tr. at 172). If she spills something, she uses a towel and pushes it around the floor with her foot (Tr. at 172). Plaintiff has four vacuum cleaners and uses one to vacuum her living room (Tr. at 172). Plaintiff does not make her bed because she sleeps on the couch (Tr. at 173). She does not sleep in the bed because it hurts her back (Tr. at 173). Plaintiff has no money for clothes (Tr. at 172). Plaintiff's sister sends her money for food every two weeks, and her neighbor then takes her to the grocery store (Tr. at 172). Plaintiff adds up her bills and expenses, calls her sister, and then her sister sends her money for the bills and expenses (Tr. at 186). Plaintiff's sister lives in Sacramento, California (Tr. at 172). Plaintiff still has her late father's computer (Tr. at 173). She knows how to use it, but she doesn't because she cannot afford to be hooked up (Tr. at 173).

Plaintiff borrowed an exercise machine, but she can stay on it for only about ten or 15 minutes (Tr. at 172). She does not walk for exercise because it makes her leg burn (Tr. at 172). She can walk around in the store for about 30 minutes at the most (Tr. at 173). Plaintiff can lift ten or 15 pounds if she lifts it in front of her (Tr. at 176).

12

Plaintiff can sit for 45 minutes at a time (Tr. at 178-179).
She can stand still for ten minutes at a time (Tr. at 179).
Plaintiff lies propped up on her couch for five hours out of
an eight-hour day (Tr. at 179). Plaintiff's hands go numb,
and she has trouble holding things (Tr. at 175). That is
why she now uses plastic dishes, because she dropped so
many, and that is also why she no longer drives (Tr. at
175). Plaintiff has to drag her garbage out of the house
because she is unable to lift it (Tr. at 176). When
plaintiff needs a refill on her medication, she has to call
her doctor and see if he will call in a prescription for her
and then her neighbor will pick it up for her (Tr. at 183).

Plaintiff takes Trazodone but she cannot drive when she
takes it because she gets blurred vision (Tr. at 174).
Vicodin helps with plaintiff's pain (Tr. at 182). She takes
that about once every three weeks or so if she tries to lift
something wrong and it "really throws [her] out" (Tr. at
182).

Plaintiff goes out for a soda or tacos with her friend
(Tr. at 177). Plaintiff is no longer able to take her dogs
for a walk or ride a bike because of her impairments (Tr. at
177-178).

13

For relief of her pain, plaintiff takes 27 apple cider tablets every day (Tr. at 178). She lies on ice bags when her back hurts (Tr. at 178). That freezes her back and enables her to sleep (Tr. at 178).

Plaintiff went to a nerve doctor at the pain center but could not afford the leg test which was $1,900 (Tr. at 185).

## C. *SUMMARY OF MEDICAL RECORDS*

On June 18, 2001, plaintiff saw Dennis Gaskill, a chiropractor with We Care Chiropractic (Tr. at 137). She was treated by We Care Chiropractic for pain in her thoracic spine (middle back), cervical spine (neck) and her right shoulder. Plaintiff went to the chiropractor 23 times from this first visit on June 18, 2001, through the end of August 2001. She went one time in September.

On September 20, 2001, plaintiff went to the emergency room at Washoe Medical Center complaining of worsening back pain for the past two days (Tr. at 125-132). She rated her pain as a ten on a scale of one to ten. She reported the pain was worse with bending or movement. She also reported that she had to stay in a hunched position to lessen the pain. Plaintiff denied any paresthesia[3] in the upper or

---

[3]An abnormal sensation of the skin, such as numbness, tingling, pricking, burning, or creeping on the skin that

14

lower extremities. She had no other symptoms. She reported that she does use tobacco. A physical exam by Guy Gansert, M.D., revealed no tenderness over the cervical or lumbar spine region, but plaintiff had significant tenderness and muscle spasms in the mid-thoracic spine (the middle back). An MRI which had previously been taken on February 7, 2001, was reviewed and showed minimal central to left-sided bulging or protrusion of the C6-7 disk but was otherwise an unremarkable study. She also had plain films which did not show any significant pathology either. Plaintiff was given a trigger point injection. She was diagnosed with acute myofascial back pain with no disk involvement. She was prescribed Flexeril, one every eight hours (15 pills) and Vicodin, (20 pills) for pain.

After plaintiff's visit to the emergency room, she resumed her appointments with the chiropractor (Tr. at 136). Plaintiff went to We Care Chiropractic seven more times during October and November 2001. Her last visit was November 5, 2001.

On December 12, 2001, Peter Christiansen, D.O., referred plaintiff to a pain clinic for evaluation of

---

has no objective cause.

Case 6:05-cv-03208-REL   Document 12   Filed 12/12/05   Page 15 of 45

chronic pain (Tr. at 151).  He noted at the bottom of that
referral form that plaintiff had been seen by him "one time
only".

On January 22, 2002, plaintiff was seen by Benjamin
Lampert, M.D., of the Pain Clinic at St. John's Regional
Health Center (Tr. at 138-140).  She reported that she had
hurt herself while moving boxes on November 27.  She said
she was getting "somewhat better with local treatment, some
salves and so forth on her legs.  She is rehabilitating
herself.  At first she could hardly walk but at this point
she is having some improvement in her function."

Physical examination of the lumbar spine revealed good
range of motion with no tenderness, no muscle spasm or
dyssymmetry, and negative straight leg raising.  She did
have a questionable positive Patrick's maneuver[4] on the
left.  Neurological examination revealed sensory

---

[4]Patrick's test is used to detect pathology in the hip
and/or the sacroiliac joint. The patient is instructed to
lie in the supine position on the examining table and place
the foot of the involved side on the opposite knee, which
abducts and externally rotates the hip. If this position
produces inguinal pain, pathology in the hip joint or
surrounding muscles should be suspected. This is known as
the *fabere* sign because of the motions required to produce
the pain: *F*lexion, *AB*duction, *R*otation, and *E*xtension. Pain
on internal rotation of the hip is also a sign of hip
pathology.

16

hyperesthesia[5] of the left thigh in the L1 and obturator nerve[6] distribution. Some tenderness was noted over the pubic ramus[7] and femoral outlet on the anterior aspect of her groin with no lymphatic or cardiovascular problems in the lower extremity.

Dr. Lampert detected no atrophy. He diagnosed obturator neuropathy [abnormality of the nerve in the thigh]. "I am going to send her to Dr. Pak[8] for an EMG and nerve conduction studies, AP and lateral lumbar spine and pelvic X-rays. She will return to see me for possible obturator nerve blocks should conservative treatment not help." Dr. Lampert gave plaintiff a prescription for Neurontin[9].

---

[5]An abnormal or pathological increase in sensitivity to sensory stimuli.

[6]A nerve that arises from the second, third, and fourth lumbar nerves in the psoas muscle, enters the thigh through the obturator canal, and supplies the muscles and skin on the medial side of the thigh.

[7]Pelvic bone.

[8]A request was sent to Ronald Pak, M.D., for plaintiff's medical records. The form was returned with a note which said plaintiff had cancelled both appointments and had never been seen in Dr. Pak's office (Tr. at 158).

[9]Used to treat seizures and nerve pain.

17

On March 11, 2002, Dr. Christiansen prescribed Vicodin and Flexeril for chronic pain syndrome (Tr. at 150).

On June 3, 2002, plaintiff saw Dr. Christiansen and complained of severe back pain (Tr. at 150). Plaintiff had just returned from Reno, Nevada, the previous day. She "demanded a shot" and was given a shot of Vistaril [relieves anxiety]. She was prescribed Neurontin, Risperdal for vomiting, and Lortabs[10].

On July 17, 2002, plaintiff returned to see Dr. Christiansen (Tr. at 149, 156). "Refuses to take Risperdal." Plaintiff's total cholesterol was 249 (should be below 200), her triglycerides were 199 (should be below 150). Plaintiff reported that she was dieting to lose weight, was walking more (one mile per day). Plaintiff was still smoking. Dr. Christiansen diagnosed lumbar disc syndrome and peripheral neuropathy.

On November 4, 2002, Dr. Christiansen saw plaintiff and diagnosed fibromyalgia (Tr. at 149). He prescribed Paxil.

On April 30, 2003, plaintiff returned to see Dr. Christiansen (Tr. at 148-149). She continued to have back pain and numbness in her legs and arms. She had not been to

_____

[10]A combination of acetaminophen (Tylenol) and hydrocodone (a narcotic analgesic).

18

the pain clinic in over a year.  Plaintiff admitted to using "whiskey/coke".  He again diagnosed fibromyalgia and lumbar disc disease.  He prescribed Neurontin with one refill, and he gave her 36 samples.

On May 2, 2003, plaintiff had blood work done (Tr. at 154).  Her total cholesterol was 253, her triglycerides were 604, and her HDL was 34 (should be 40-59).

On May 23, 2003, a letter was received[11] written by Dennis Gaskill, a chiropractor with We Care Chiropractic (Tr. at 134).  The letter stated as follows:  "I treated Ms. Beth in my office from 06/08/2001 until 11/05/2001.  She described moderate pain in her thoracic spine, right shoulder and cervical spine.  I did not get any history of an acute injury, however, more of a chronic problem.  During her treating program she made very good progress, in fact near normal in November.  Her x-rays taken of the cervical and thoracic spine absent fractures, sublaxations noted in upper thoracic spine.  Military cervical spine with posterior disc wedging noted C4-5."

---

[11]The letter is not dated, but has a "received" stamp dated May 23, 2003.  I cannot tell who "received" this letter.

On June 25, 2003, plaintiff saw Thomas Corsolini, M.D., for a disability medical evaluation (Tr. at 142-143). Plaintiff told Dr. Corsolini that the Neurontin prescribed by Dr. Lampert had been helpful in reducing the spasms in her back and reducing the intensity of numbness in her left thigh. Plaintiff said she is a smoker. Dr. Corsolini performed a physical exam. "Direct muscle testing reveals no specific weakness in the muscles of either lower extremity. Muscle stretch reflexes normal bilaterally at biceps, triceps, and brachioradialis locations. Muscle stretch reflexes normal bilaterally at patellar and Achilles locations. Straight leg raising test nonpainful bilaterally, hip joint ROM [range of motion] intact without increase in pain bilaterally. Romberg test[12] normal, tandem gait[13] performance is good. Palpation along the back does not seem to be tender at any location. Tinel's sign[14] and Phalen's

---

[12]The patient stands with her feet together. The doctor notes whether the patient sways. The patient is then told to close her eyes, and again the doctor notes whether the patient sways. This test is part of a neurological exam.

[13]The patient walks a straight line while touching the heel of one foot to the toe of the other with each step.

[14]Tinel's sign is a way to detect irritated nerves. It is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or "pins and needles" in

test[15] are both negative at each wrist." Plaintiff had
normal range of motion in her shoulders, elbows, wrists,
knees, hips, ankles, cervical spine, and lumbar spine. Her
grip strength was normal, she had full hand extension,
finger opposition, full upper extremity strength, full lower
extremity strength, and normal straight leg raising. Dr.
Corsolini recommended no standing limitations, no sitting
limitations, no lifting limitations, no carrying
limitations, no walking limitations, no speaking limitation,
and no limitations on handling objects.

Dr. Christiansen completed a Medical Source Statement
on February 7, 2005 (Tr. at 13-15). He found that plaintiff
could frequently lift five pounds, occasionally lift ten
pounds; stand or walk for a total of four hours in an eight-
hour day, stand or walk for one hour at a time; sit for a
total of four hours in an eight hour day, and sit for one
hour at a time. He found that plaintiff was limited in her
ability to push and pull by 50% because of pain,
coordination, and strength. He found that plaintiff should

_____

the distribution of the nerve.

[15]The patient allows her wrists to fall freely into
maximum flexion and maintains the position for 60 seconds or
more. A sensation of tingling results in a positive
Phalen's maneuver.

never climb, kneel, or crouch; and could occasionally balance, stoop, crawl, reach, handle, finger, or feel. When asked whether plaintiff had environmental restrictions such as "heights, machinery, temperature extremes, dust, fumes, humidity, vibration, etc.", he checked, "yes" and wrote "poor coordination". When asked to describe the clinical and laboratory findings and symptoms or allegations from which the limitations were concluded, Dr. Christiansen wrote, "complains of pain for many years, mainly back pain". He concluded that resting for one to two hours every one to two hours would be "medically helpful to necessary". The final question on the form is this: "Remarks, if you desire (such as the date you suggest the patient's claim should be reviewed for medical or psychological improvement):" and Dr. Christiansen wrote, "Apparently hasn't worked since Nov. 2000. An MRI of lumbar spine would be helpful. She admits to having an alcohol problem."

## V. FINDINGS OF THE ALJ

On November 5, 2004, ALJ Martin Spiegel entered his opinion (Tr. at 25-30). The ALJ found at step one of the sequential analysis that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 26). However, he found at step two that plaintiff

22

does not have an impairment or combination of impairments
which have more than a minimal affect on her ability to do
basic work activities (Tr. at 29).  He relied on the lack of
medical records, and his finding that plaintiff's subjective
complaints are not credible.

Therefore, plaintiff was found not disabled at step two
of the sequential analysis.

## VI.  *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that
plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony
is primarily for the Commissioner to decide, not the courts.
Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin
v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are
inconsistencies in the record as a whole, the ALJ may
discount subjective complaints.  Gray v. Apfel, 192 F.3d
799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301,
303 (8th Cir. 1993).  The ALJ, however, must make express
credibility determinations and set forth the inconsistencies
which led to his or her conclusions.  Hall v. Chater, 62
F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956
F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly
discredits testimony and gives legally sufficient reasons

23

for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

24

The claimant reported 5-6 outpatient and emergency room treatments at the Washoe Health facility in Reno, Nevada from 2000 to 2001; however, she was only seen once at that facility on September 20, 2001. She was assessed to have myofascial back pain and given a trigger point injection. She did not present any complaints concerning upper or lower extremities, which is contrary to her allegations herein.

. . . She said that she took Vicodin PRN [as needed] and wore a back brace most of the time; however, there is absolutely no indication anywhere in the medical records in evidence of her having been prescribed a back brace. Her statement of need to take pain medication only on an as needed basis contradicts her alleged severity of pain at the hearing before the undersigned. Dr. Christiansen assessed "chronic pain" syndrome, and referred her to a pain management center, Benjamin Lampert, M.D., for care. He prescribed Vicodin and Flexeril. The claimant went to see Dr. Lampert only one time in January 2002. She told Dr. Lampert that she had pain in her left thigh from "moving some boxes" November 27, 2001. She said that she only took Vicodin "once in a while when it hurts pretty bad." She did not even have any pain medication at that time. Again, her statements of severe pain only "once in a while" contradicts her assertions in her claim for disability. . . . Dr. Lampert referred her to Ronald Pak, M.D., an occupational and rehabilitation specialist. . . . The claimant did not go to see Dr. Pak at all. She did not return to Dr. Lampert for further help with pain management. She saw Dr. Christiansen two months later in March 2002, complaining of back pain existing just since the night before and that morning. This is not how the claimant described the frequency and duration of her back complaint in her claim for disability, wherein she has alleged constant pain and numbness on a continuing basis. Dr. Christiansen prescribed Flexeril and Vicodin for her. Dr. Christiansen next saw her three months later for complaint of severe pain in her back and "demanding a shot". Dr. Christiansen noted that she had not been to an emergency room for back pain relief in over a year. She had just returned from a trip to Reno the day before. Dr. Christiansen gave her an

25

injection.  The claimant [returned] to see him in June
and July 2002 for rechecks.  She did not return
thereafter for four months until November 2002, at
which time she presented complaints concerning her left
upper extremity, off and on, for 3-4 days.  She had a
normal exam. Dr. Christiansen assessed fibromyalgia and
prescribed Paxil.  The medical record does not show any
of the requisite criteria for a diagnosis of
fibromyalgia. . . .  The claimant did not return to Dr.
Christiansen for over five months, April 30, 2003, at
which time she complained of back pain, and numbness in
her legs and arms.  Dr. Christiansen noted that she had
not returned to Dr. Lampert.  He prescribed Flexeril.
The claimant was next seen in November 2003 for
bronchitis.  Dr. Christiansen has declined to provide a
report to the Social Security Administration concerning
the claimant's limitations to do work-related
activities.

. . .  The aforestated are the sum total of the
claimant's treatment records in evidence.  There are
significant inconsistencies in the records as compared
to the allegations of the claimant in her disability
claim as to her medical treatment history; nature,
frequency and duration of subjective complaints and
functional limitations; and causation factors of her
conditions.  She has not sought nor received medical
care as claimed herein.  She did not even go to Dr. Pak
for a work-up or ever return to Dr. Lampert. . . .  She
only saw Dr. Christiansen once in 2001, four times in
the year 2002, and once in 2003, for complaints
relevant to the matter herein. . . .  It is not
consistent that someone with the alleged severity of
subjective complaints and limitations as the claimant
in this claim would not be seeing doctors for relief.
She has not needed to take prescriptive medications for
pain and other subjective complaints on a consistent,
ongoing basis, but rather, only sporadically as needed.
She does not need any type of supportive or assistive
device.  She has not presented the same magnitude of
alleged functional limitations to her doctors as
herein.  The discrepancies in her statements to her
doctors and her statements herein raise the issue of
possible secondary gain in her claim of disability.

Case 6:05-cv-03208-REL   Document 12   Filed 12/12/05   Page 26 of 45

Moreover, she told Dr. Corsolini that the Neurontin medicine helped her.

. . . It is clear that medical evidence does not support the claimant's statements in this matter. Moreover, the claimant is inconsistent in her various statements of record herein. In the Claimant Questionnaire that she completed on March 19, 2003, she reported that she lived with and helped take care of her mother. She typically used the computer daily for an hour or so at a time. She took care of the grocery shopping, only needing help to carry the dog food and grocery bags. She was able to shop for an hour at a time. She said she was able to walk as long as 45 minutes. She did the cooking and dusting. She was able to drive. She said that her "back seizures are almost under control, they are more like spasms, which occur once or more a month. Depending on if I move or lift anything." The spasms last 6 to 10 hours. The claimant's mother subsequently passed away in March 2004. Previously her mother supported her financially. The claimant has said that she now cannot afford her medications, but the undersigned does not find that persuasive in that the claimant had financial means to afford treatment and medications when living with her mother, and is now fully supported by her sister. In the questionnaire that the claimant and her representative completed and signed on June 18, 2003, the claimant reported no difficulty in standing or walking or lifting up to ten pounds. Thus, one sees that the claimant's statements are not only unsupported and inconsistent with the medical evidence, but also her own statements found within the evidentiary record. The claimant's statements herein cannot be relied upon as probative evidence concerning her subjective complaints and functional abilities.

(Tr. at 27-29).

Plaintiff did not address the Polaski factors point by point in her brief. Rather she has specific criticisms of the ALJ's analysis. Therefore, rather than discuss each

Polaski factor separately, I will address the specific issues raised by the plaintiff.

1. Plaintiff argues that, contrary to the ALJ's conclusion, there is an "abundance of substantial objective medical evidence in the record, including the prescribing of narcotic medications and a positive MRI of the cervical spine" supporting plaintiff's subjective complaints.

Plaintiff was prescribes Lortabs, a narcotic analgesic, on one occasion, June 3, 2002. She was prescribed Vicodin by Dr. Christiansen after she reported that nothing has helped her except Vicodin. She testified during the hearing that she takes Vicodin once every three weeks or so. The MRI taken on February 7, 2001, showed "minimal" bulging or protrusion of the C6-7 disk but was otherwise an unremarkable study. This is hardly "abundant objective evidence" supporting plaintiff's subjective complaints.

2. Plaintiff argues that the ALJ should not have considered the fact that plaintiff helped her mother since there was no evidence of how plaintiff helped her mother and she said she helped when she could. I agree with plaintiff, the only evidence of the type of help plaintiff gave her mother was plaintiff's statements that she drove her mother to the doctor. However, the ALJ did not rely heavily on

28

this fact in concluding that plaintiff's complaints were not credible.

3. Plaintiff argues that the ALJ erroneously found that plaintiff's claim of being unable to afford her medicine was not persuasive since her mother paid for all her expenses and since her mother's passing, plaintiff's sister has now "fully supported" plaintiff. Plaintiff states that "the record is devoid of even one scintilla of evidence suggesting that Ms. Beth's sister pays for her medical treatment and/or medications."

Plaintiff testified that she adds up her expenses and calls her sister, and then her sister sends her the money for those expenses. Plaintiff is correct in that no one actually said that plaintiff's medical expenses were included in those amounts. However, it is undisputed that plaintiff's sole source of income is supplied by her sister. With that money sent by her sister, plaintiff purchases cigarettes, dog food and cat food for her pets, cable television service, and whiskey. I understand the pets belonged to plaintiff's mother before she died; however, plaintiff cannot plausibly argue that she cannot afford medicine for her high triglycerides which costs only $34.20

per month when she is able to buy pet food, along with
cigarettes, whiskey, and cable television entertainment.[16]

4.  Next plaintiff argues that the ALJ's conclusion
that plaintiff's answer to the claimant questionnaire is
inconsistent with her testimony regarding how long she can
sit.  Plaintiff quotes at length testimony regarding
plaintiff's use or non-use of her late father's computer,
pointing out that her statement that she used the computer
for an hour per day does not necessarily mean it was one
hour straight or that she sat while using the computer for
an hour.

I can find nothing in the ALJ's opinion which states
that plaintiff's answers in her claimant questionnaire are
inconsistent with her testimony about her ability to sit.
The ALJ's opinion is quoted at length above, and he does
discuss her claimant questionnaire and her testimony and
concludes that the two are inconsistent.  But he
specifically stated that in the claimant questionnaire,
plaintiff said she had no difficulty standing or walking or

---

[16]I also note defendant's argument that this is an
application for Title II benefits, not Title XVI benefits,
indicating that plaintiff would not have met the income and
resource limitations to apply for Supplemental Security
Income benefits.

30

lifting up to ten pounds, and she said she could shop for an hour.  In her testimony, plaintiff said she could stand for only ten minutes at a time and could walk around a store for only 30 minutes.

There are myriad inconsistencies between plaintiff's claimant questionnaire and her hearing testimony.  For example, plaintiff stated in the questionnaire that her back seizures are "almost under control they are more like spasms" which she said occur once or more per month depending on if she lifts anything.  She testified at the hearing that she experiences constant and continuous back pain.

Although there were certainly inconsistencies in the claimant questionnaire and plaintiff's hearing testimony, the ALJ did not specifically state that the inconsistencies involved her ability to sit, and he did not rely on her claim of using the computer for an hour to support such a conclusion.  I do note here, however, that even plaintiff's treating physician, Dr. Christiansen, stated that plaintiff could sit for four hours out of eight and could sit for one hour at a time.

5.  Plaintiff argues that the ALJ's statement that plaintiff took care of the grocery shopping, only needing

help to carry the dog food and grocery bags, omitted significant information.

The ALJ clearly did not rely solely on the fact that plaintiff could go grocery shopping for an hour with assistance in his decision to discredit plaintiff's subjective complaints. In her claimant questionnaire, plaintiff reported that she can shop for an hour. The rest of the information in the record can be dissected to determine whether plaintiff can REALLY shop for an hour, or whether this means she can shop for an hour while sitting down periodically, etc. However, the importance of that one fact in the face of the remainder of this record is really minimal. Plaintiff reported that she could run errands, shop, and go to doctors which could take about two hours. In a questionnaire from the Office of Hearings and Appeals, she reported that she had no difficulty walking or standing. Plaintiff's medical records indicate that according to her chiropractor, she was "near normal" in November 2001; plaintiff was moving boxes in November 2001; she traveled to Reno, Nevada, in the spring of 2002; she reported walking a mile a day in July 2002. Plaintiff's own treating physician stated that plaintiff could walk, stand, or sit for four

32

hours per day, and this was based entirely on plaintiff's subjective complaints.

6.   Plaintiff next states that the ALJ's reliance on plaintiff's questionnaire wherein she said she had no difficulty standing or walking is erroneous, because the form does not ask about "the **sustained duration** of walking or standing." This argument is not plausible. It can hardly be said that if one asks a person if she has any trouble with standing or walking and she says "no", that the person really meant that she could only stand or walk with difficulty or with frequent breaks. Plaintiff said she had no difficulty with standing and walking. The ALJ was entitled to rely on that statement.

7.   Plaintiff argues that the ALJ should not have relied on plaintiff's ability to cook and dust because she only cooked easy things and she infrequently dusts. The ALJ's opinion with regard to cooking and dusting is this: "She did the cooking and dusting." That is it. Again, this is but one statement of the list of things plaintiff was able to do or stated that she was able to do. There is no argument by the ALJ that plaintiff did significant cooking, and he clearly did not rely on the ability to cook or dust in any substantial way.

33

8.   Plaintiff next points to the ALJ's statement regarding plaintiff's emergency room visit:  "She did not present any complaints concerning upper or lower extremities, which is contrary to her allegations herein." Plaintiff argues as follows:  "The nature of emergency medicine is to treat conditions that reach a crisis level. Obviously, Ms. Beth's intractable back pain took precedence over any other symptoms she may have been experiencing [at] the time."

Contrary to plaintiff's argument, the medical records from plaintiff's emergency room visit state that plaintiff was seen for back pain that started two days earlier.  The record states, "Plaintiff denied any paresthesia in the upper or lower extremities.  She had no other symptoms." The records do not fail to mention anything but back pain. They state very clearly that plaintiff "had no other symptoms."

In addition to all of the above, I note that the ALJ pointed out numerous inconsistencies between plaintiff's testimony and the record.  Plaintiff told her treating physician that she had a problem with alcohol and had admitted to using whisky.  Yet when specifically asked about alcohol during the hearing, plaintiff testified that she

34

does not drink and that she would occasionally have a mixed
drink at a party when she was in her 30's (i.e.,
approximately 20 years ago).  She testified that she could
barely move, yet no doctor ever found any signs of muscle
atrophy or any other indication that plaintiff is largely
immobile.

I find that the substantial evidence in the record
supports the ALJ's determination that plaintiff's subjective
complaints of disability are not credible.  Therefore, her
motion for judgment on this basis will be denied.

### VII. OPINION OF DR. CORSOLINI, CONSULTING PHYSICIAN

Plaintiff argues that the ALJ erred in relying on the
opinion of Dr. Corsolini, the consulting physician.  "The
Administrative Law Judge omitted reference to the fact that
Dr. Corsolini's report fails to indicate that he reviewed
any medical records in conjunction with his examination.  At
the time Dr. Corsolini saw Ms. Beth, Dr. Christiansen has
been treating her for 18 months.  Moreover, there was also a
positive MRI in the record performed more than two years
prior to Dr. Corsolini's examination."

Referring to Dr. Christiansen's records would not have
enlightened Dr. Corsolini.  Dr. Christiansen did not perform
any tests other than blood tests, his records consist of a

35

sentence or two each, and his diagnoses are based entirely on plaintiff's subjective complaints of pain. Dr. Christiansen diagnosed fibromyalgia without having mentioned trigger points or any other symptoms of fibromyalgia. He prescribed Vicodin after plaintiff indicated that was all that worked for her (despite having a minimal history of different pain medications). Dr. Christiansen gave plaintiff a shot of Vistaril when plaintiff came in "demanding a shot".

Dr. Christiansen's records consist of a sentence containing plaintiff's subjective complaints, and then his prescription for whatever medication. There is little substance in those records that would have been of help to Dr. Corsolini. Again, this assumes Dr. Corsolini did not review the records, which is a fact that is unknown.

Plaintiff also brings up the positive MRI again. The MRI taken on February 7, 2001, showed "minimal" bulging or protrusion of the C6-7 disk but was otherwise an unremarkable study. Plaintiff has failed to explain how this MRI would have changed Dr. Corsolini's opinion, again assuming he did not review it.

Dr. Corsolini performed a physical examination. He tested plaintiff's walk; muscle weakness; muscle stretch

36

reflexes at the biceps, triceps, and brachioradialis locations; muscle stretch reflexes at the patellar and Achilles locations; straight leg raising; hip joint range of motion; Romberg test; tandem gait performance; Tinel's sign; Phalen's sign. He tested for tenderness along plaintiff's back. He tested her shoulder flexion, abduction, adduction, internal rotation, and external rotation; her elbow flexion, extension, supination, and pronation; her wrist dorsiflexion, palmar flexion, radial deviation, and ulnar deviation; her knee flexion and extension; her hip flexion, extension, abduction, and adduction; her ankle dorsiflexion and plantar flexion; her cervical spine lateral flexion; flexion, and rotation; her lumbar spine flexion and lateral flexion; her grip strength, her full hand extension; her finger opposition; her upper extremity strength; her lower extremity strength; and straight leg raising. Every single one of those tests was normal.

Because Dr. Corsolini's opinion is based on a thorough exam, the results of which are not contradicted by any medical evidence in this record, I find that the ALJ properly relied on his findings.

## VIII. FINDING OF NO SEVERE IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that plaintiff's impairment is not severe.

First plaintiff takes exception to the ALJ's "counting" plaintiff's visits to her treating physician. The ALJ noted that plaintiff saw Dr. Christiansen once in 2001, four times in 2002, and once in 2003. Plaintiff points out that the ALJ ignored the number of times Dr. Christiansen refilled plaintiff's pain medication.

Plaintiff took Vicodin for her back pain. Dr. Christiansen prescribed Vicodin, 20 tablets, on December 11, 2001, with one refill. He wrote her two more refills for 20 tablets each on December 31, 2001. On March 11, 2002, he prescribed Vicodin, 20 tablets. On June 3, 2002, he prescribed Lortab, 20 tablets. That is the extent of the narcotic pain medication, and it totals 120 tablets during the entire time plaintiff was treated by Dr. Christiansen, or a period of 15 months. Forty of the Vicodin tablets were taken in the second half of December 2001, leaving a total of 80 tablets prescribed from December 31, 2001, through June 3, 2002, or a five-month period. The narcotic pain medication is to be taken every four to six hours as needed for pain. Even just two pills a day would mean a 20-pill

prescription would be used up in ten days.  Yet over a
period of more than 150 days, plaintiff used only 80
narcotic pain pills.  Plaintiff even reported herself that
she uses Vicodin about once every three weeks.  That is not
an indication of disabling pain.

Flexeril is a muscle relaxer, not a severe pain
medication.  Neurontin, a medication used for nerve pain,
was prescribed on January 22, 2002; March 11, 2002; June 3,
2002; October 18, 2002; January 21, 2003; and April 30,
2003.  That is six prescriptions over a 16-month period.

There is no question that plaintiff was prescribed pain
medication.  I do not even read the ALJ's opinion to state
that he believes plaintiff does not experience pain.  The
ALJ found that plaintiff's pain does not have more than a
minimal affect on her ability to do basic work activities.

The Code of Federal Regulations sets out the
requirements for finding that an impairment is severe:  20
C.F.R. § 404.1520(a)(4)(ii) states, "At the second step, we
consider the medical severity of your impairment(s). If you
do not have a severe medically determinable physical or
mental impairment that meets the duration requirement in §
404.1509, or a combination of impairments that is severe and
meets the duration requirement, we will find that you are

not disabled." Further, 20 C.F.R. § 404.1520(c) states, "You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. . . ."

To determine what constitutes a severe impairment, we look to 20 C.F.R. § 404.1521:

What we mean by an impairment(s) that is not severe.

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

As is aptly pointed out by the defendant, plaintiff's argument on this factor is aimed at explaining how substantial evidence could have lead the Commissioner to a different decision as opposed to showing that substantial evidence does not support the decision. The substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d at 1073 n. 5; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

In this case, the ALJ relied on plaintiff's failure to seek treatment, failure to comply with treatment, the success of the treatment she had, the lack of objective evidence, the inconsistencies in her allegations, her exaggerations, the opinion by her chiropractor that she was normal, the opinion by an examining physician that she was not at all limited at the time of consultative examination, and her lack of continuous prescription medications. Plaintiff had one MRI in February 2001 which showed minimal bulging and was otherwise an unremarkable study. There are no other tests in the entire record, other than the physical

41

exam performed by Dr. Corsolini who found no limitations at all. Dr. Christiansen, plaintiff's treating physician, based all of his opinions on nothing but plaintiff's subjective complaints of pain. The ALJ properly found plaintiff's subjective complaints of pain not credible. Her alleged onset date of disability, November 20, 2000, corresponds with no injury or accident, and there are no medical records until June 18, 2001, when plaintiff began seeing a chiropractor. The ALJ noted that plaintiff reported five or six visits to Washoe Health System, but the records reflect that she went to the emergency room there on only one occasion, another example of plaintiff's exaggerations. During that one visit, nearly a year after her alleged onset date, plaintiff claimed that her pain had started only two days earlier.

Plaintiff argues that her obesity and high triglycerides should have been "severe" impairments. However, in plaintiff's own brief, she discusses nothing but the "increased risk" of limitations because of these conditions. An increased risk does not equal a severe impairment.

Because plaintiff has failed to establish that the ALJ's decision at step two of the sequential analysis is not

42

supported by substantial evidence in the record, her motion for judgment on this basis must be denied.

### IX. REMAND

Finally, plaintiff argues that because Dr. Christiansen's medical source statement was dated March 8, 2005, and the Appeals Council's denial is dated March 11, 2005, "[o]bviously the Medical Source Statement . . . and the Appeals Council denial 'crossed in the mail.'" Plaintiff requests a remand so that this new evidence can be evaluated.

Sentence six of 42 U.S.C. § 405(g) authorizes the court to remand a case to the Commissioner where "new and material evidence is adduced that was for good cause not presented during the administrative proceedings." Krogmeier v. Barnhart, 294 F.3d 1019, 1024-25 (8th Cir. 2002); Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). Material evidence is "non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the [Commissioner's] determination." Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993).

First, I note that the letter from the Appeals Council states that, "The Council has now received more evidence."

43

> The medical assessment from Dr. Christiansen is based
> primarily on the claimant's subjective complaints and
> is not consistent with the other medical evidence
> already contained in the record. The weight of the
> medical evidence continues to support the
> Administrative Law Judge's decision. The Appeals
> Council concludes that there is no basis for reopening
> that decision. . . .

(Tr. at 6). Therefore, it is clear that the medical source statement and the Appeals Council decision did not "cross in the mail" as alleged by plaintiff.

I have reviewed Dr. Christiansen's medical source statement, which is summarized in the Medical Records section of this order, and find that there is no reasonable probability that the ALJ's decision would have been different if that medical source statement had been included in the file before him. As was stated by the Appeals Council and discussed at length above, Dr. Christiansen did not perform any tests. There is no indication in any of his medical records that he even reviewed the MRI from February 2001. All of his medical diagnoses were based entirely on plaintiff's subjective complaints. There is no basis for relying on this opinion.

**X.   *CONCLUSIONS***

Based on all of the above, I find that substantial evidence in the record as a whole supports the ALJ's

44

decision in finding plaintiff not credible, in relying on the opinion of Dr. Corsolini, and in finding that plaintiff's impairments are not severe.  Additionally, I find that there is no basis for a remand.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.  It is further

ORDERED that plaintiff's alternative request for remand is denied.


_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 12, 2005